LUTHER GOBLE junior, and Wife, v. PHEBE GRANT et al.

If previous general insanity or incapacity be established, the burden of showing capacity at the time of executing the will, rests upon the person offering it for probate.

Though the omission by a testator to make any provision for a part of his children, will not of itself suffice to establish incapacity, yet such an omission not satisfactorily accounted for, is entitled to great consideration when there is any evidence of a fraudulent procurement of the will, or when the will is made by the testator *in extremis* in favor of those around him.

Where there is a fair ground for re-examination, costs ought not to be awarded against the appellant, though the decree be affirmed.

APPEAL from a decree of the orphans' court of the county of Essex, admitting to probate an instrument purporting to be the last will and testament of Zephaniah Grant. The instrument was offered for probate by the executors. The caveat was filed by one of the testator's daughters and her husband.

*Jackson,* for appellants.

*W. Pennington,* for respondents.

THE ORDINARY. On the third of September, eighteen hundred and thirty-three, a caveat was filed in the surrogate's office of the county of Essex, by Luther Goble, junior, in behalf of himself and his wife Sarah, formerly Sarah Grant, against proving any instrument purporting to be the last will and testament of Zephaniah Grant, then lately deceased. On the tenth of the same month, an instrument purporting to be the will of Zephaniah Grant, was offered for probate at the office ; and citations having issued to bring in the parties interested, and the evidence as well for as against the instrument having been heard and duly considered, the orphans' court, on the fourteenth of December, eighteen hundred and thirty-three, adjudged and decreed that the said instrument was the last will and testament of the said Zephaniah Grant, and ordered the same to be admitted to

[Goble and Wife v. Grant et al.]

probate. From this decree the caveators appealed, and at the last stated term the cause was submitted to the court without argument.

On examining the evidence, I have discovered nothing illegal or irregular in the execution of the will. After having been prepared, according to the direction of the testator, by a professional gentleman of the place in which he resided, it was carried to him, distinctly read over to him, and approved. It was then signed, published and acknowledged in the presence of three witnesses, who signed their names to it in the presence of the testator and of each other. The factum of the will appears to be in entire conformity with the statute.

I presume the question intended to be raised by the evidence is, whether the testator, at the time he executed the will, was of sound and disposing mind and memory; or in other and more simple language, whether his mind and memory were sufficiently sound to enable him to know and understand the business in which he was engaged, at the time when he executed the will. Upon this point there appears to be but one opinion entertained by those who were present at the time and participated in the transaction.

Henry Rogers states, that on the day before the will was executed, he was sent for to the house of testator, and there received from him instructions for drawing the will; and that no person was present with them at the time. On the day of the execution of it, he carried it to the testator, and read it to him before he executed it. He has no doubt, and never has had any, that at the time of giving the instructions and of executing the will, the testator was of sound understanding. The testator took the will after it was executed, and some time after met him in the street and paid him for the service. He knew nothing particularly of the habits or capacities of the testator before the will was drawn. He was feeble at the time, and the witness found him sitting up in the chair, and he said he had been unwell; he thinks he said his disease was pleurisy. The testator was at that time, and has been subsequently, engaged in business.

Jonathan E. Crane, another instrumental witness, says, it is so long since the transaction that he does not recollect the conversation at the time; but he is of opinion the testator understood the business of the will; that no idea came across his mind at the time of the execution of the will, that the testator was unsound in mind. He looked pale and weakly, as if he had been ill. He was then engaged in business, and has been since, up to the time of his decease, in September, eighteen hundred and thirty-three.

Jonathan Cory, the other instrumental witness, says, he lived near the testator, and was on terms of considerable intimacy with him : had been acquainted with him ten years and upwards. The witness cannot recollect whether the testator had been unwell at the time of executing the will; but witness considered the testator as understanding what he was about, nor has he any idea that the testator was not of sound mind, nor has he ever had. He has seen testator at times in liquor, when he thought him disqualified for the purpose of making a will; but is satisfied that the testator was at that time sober and rational. He would not otherwise have witnessed the will. Witness was well acquainted with him, and could have discovered any thing like intemperance. The witness further states that the testator, when he died, was about sixty-five years of age, and that he had occasional turns of intemperance, at which times he was not capable of attending to business; that he never saw him unsound in mind except when under the influence of liquor; that he has seen him immediately upon a recovery from one of his capers, and that then he was capable of doing business.

The testimony of the subscribing witnesses makes a strong case in favor of the will.

The caveators do not pretend to set up any thing like general insanity or incompetency previous to making the will. If such state could be established, the burden of showing capacity at the very time of executing the will, would rest upon those offering it for probate. As it is, it rests upon those who make the allegation of insanity or incapacity, to make it out to the satis-

faction of the court. If they fail to do this, the will must be proved.

. If I have rightly apprehended the case, the caveators put themselves upon this position, that the testator was a man who was addicted to occasional fits or seasons of intemperance; that during those periods, and while he was recovering from the effects of his misconduct, he was incapable of transacting business, and that he was in such situation when the will was made. This I take to be the strong if not the only objection urged against the will.

· As to the fact of occasional intemperance, there can, unfortunately, be no doubt ; all the witnesses who speak on this subject agree in their statements; and they also agree in opinion, that when under the influence of liquor, during those periods, he was not competent to attend to business. Was such his situation when he made the will? That is the point to be established by the caveators. Have they established it?

The will bears date the twenty-third of August, eighteen hundred and twenty-four. The first witness examined on the part of the caveators is Aaron Conselyea. He first knew the testator on the fourteenth of July, eighteen hundred and twenty-four : went to work with him at that time and continued for four years, and boarded with him. The testator would have one or two frolics in a year, and they would continue a week or two weeks, during which he was destitute of his mind and senses the most part of the time, and paid little attention to business. For some days or a week after his frolics, while convalescent, he would not be restored to his mind, as witness supposes from what he saw of him : he evinced, as witness thinks, a feebleness of body and mind. The first of these frolics after witness went there, was, he thinks, about August—from four to six weeks after he went ; and if he had one it was slight, or of short duration. He says afterwards, he thinks that the testator either had one of these frolics or was about to have one and had some other complaint at the time he has been deposing to, but the present impression of witness is, that it was one of his intemperate frolics.

[Goble and Wife v. Grant et al.]

On his cross-examination he says, that in speaking of the effects of testator's frolics during the after week, he means more particularly as to his strength of body than of his mind. He cannot state any act of the testator, indicating a want of mind, during the "recruiting days," nor can he state any thing about the mind or capacity of the testator at the time the will was executed—for he does not know when it was made. He cannot say positively that the testator had any frolic in the month of August, eighteen hundred and twenty-four, but he thinks he had. Witness thinks there was some other complaint with which the testator was ill at that time, and has some indistinct recollection that the family called it pleurisy.

The testimony of this witness can have little or no weight in making out the fact, that at the very time of executing the will the testator was legally incompetent. He speaks, as he says, from general recollection, the most treacherous of all guides in reference to dates and times. He thinks testator had one of his capers in August, but is not certain; nor is he certain whether it was really one of them, or the pleurisy, with which the family said he was visited; and whether it was one or the other, he can give us not the least information as to the state of testator's mind when the will was made, for he does not know when that was. This evidence, standing alone, is entitled to but little consideration.

The next witness is Stephen V. Taylor. He details the manner and frequency of testator's frolics very much as has been done by the former witness, and thinks that testator, during the period of his convalescence, was not capable of attending to his business. He worked for testator in August, eighteen hundred and twenty-four, and thinks he had a frolic, which was succeeded by sickness. Knows he was dangerously ill during that season, and thinks it was about the time of the frolic.

On his cross-examination he says, he thinks the termination of the frolic he has spoken of, was an attack of pleurisy, and thinks that Dr. Ward was his physician. He depends on his general memory as to dates, and cannot say that the frolic spoken of was in August.

80

This evidence is also vague and uncertain, and sheds little or no light on the matter in controversy.

Moses Dodd says he was master builder of the Third Presbyterian Church, and the firm of Grant furnished the stone; the principal part of the stone-cutting was done in July, August and September, and that during this time testator's habits were not temperate and steady. He thinks the effects of intemperance were peculiar on the testator : would not suppose him for some days after a frolic capable of doing business; and during that time he had not much mind of his own, and was very tractable. He does not know the situation of testator the day the will is said to have been made.

The case is not varied, so far as relates to the state of testator's capacity at the time of executing the will; by the evidence of James Whittemore, who is the next witness examined. His knowledge of the testator's habits about that period, is derived principally from information of the family and others. As to his habits generally, he concurs in the main with the witnesses of the caveators.

Dr. John Ward states, that he was called to visit the testator on the twenty-second of August, eighteen hundred and twenty-three, (which appears to have been the day the instructions for the will were given, as the will was executed on the twenty-third,) and found the testator very ill, as he infers from the medicine he left him ; that on the twenty-third and twenty-fourth he visited him again, and must have found him much better, as he left nothing for him on either of those days. From the treatment he judges he must have been apprehensive of inflammation. His disease, he thinks, was not pleurisy, but a spasmodic affection of the muscles. The disease may have resulted from an intemperate frolic, but he does not know that it did.

On his cross-examination he says, there was nothing in the disease of which he supposed the testator to be ill, inconsistent with the full possession of his faculties.

From this view of the case as presented, I think it plain that there is no direct evidence to show, that at the time the will was

made, the testator was not in possession of the ordinary degree of mind and memory, or that he was in such a state as not fully to understand the business in which he was engaged.

There is, however, some evidence of an indirect character, which is calculated to have a bearing on the case, and will now be adverted to.

It appears that at the time of making the will, the testator had seven children; four unmarried daughters who were living at home, two daughters who were married and living from home with their husbands, and one son, Charles Grant. By the will only a small portion is given to Charles, and the married daughters receive nothing, nor are they mentioned at all. It appears further that their circumstances were not affluent, and that they had not been provided for by previous gift, except with something in the nature of an outfit at the time of marriage. So far as Charles is concerned, the provision of the will is in some measure accounted for; for Henry Rogers states, that he thinks testator, at the time the instructions for the will were given, expressed his conviction that he had made sufficient provision for his son Charles. Whether it was intended that the provision in the will was such provision, or that he had been provided for otherwise, is not very clear, nor is it very important. The testator's property at that time was small, and it would not be the duty of the court to scan with accuracy the amount received, or to be received, (even if sufficient facts were before it,) so as to determine whether the provision was a just proportion of the estate or otherwise.

In relation to the two married daughters, the omission to make any provision for them in the will, is not satisfactorily accounted for; and if there was any evidence of a fraudulent procurement of the will by that portion of the family who were at home, to the exclusion of those abroad, it would be a strong circumstance. Or if the will had been made by the testator *in extremis*, in favor of those around him, to the disinherison of other heirs, towards whom he had always exhibited an equal degree of natural affection, it would be entitled to great consideration.

But such is not the case. There is nothing in the whole evidence that looks like procurement on the part of the unmarried daughters or any of the family or their friends; and the testator, after having made the will, recovered from his indisposition; and he was conusant of the fact of having made the will, for he afterwards paid the attorney who prepared it for his services, and retained the instrument in his house up to the time of his death.

This omission, however singular it may appear, and however unable we may be to account for it satisfactorily, is not sufficient to overturn the evidence of sanity adduced by the executors. Independently of this one circumstance, there does not appear to me to be a reasonable doubt as to that evidence; and it would be dangerous to admit as a principle, that a discrimination made by the testator among those objects of his bounty who appear to have an equal claim upon him, or even the total exclusion of some of them, is sufficient to establish incapacity. Very often, the object of making a will is to discriminate, or to exclude and give preferences; and not unfrequently, the reasons for so doing are known only to the testator; and hence, if his competency be clearly established, is of comparatively little consequence.

There is some evidence going to show the testator's views of the propriety of making distinctions among children in the distribution of property, and that on a certain occasion he disapproved of such a course on the part of a relative. Admitting this to be so, it is not an uncommon thing for persons to lay down rules for others as to the management and distribution of property, which they themselves are not always willing to follow. Nor is it uncommon for persons to change their minds materially as to the disposition of their estates by will. But the evidence itself is of doubtful character in point of admissibility. Even express declarations of intention to dispose of property in a particular manner, is not to be received, unless when offered to repel or sustain a charge of fraud or circumvention of the devisee in obtaining the will: *Den* v. *Vancleve,* 4 *Wash.* 266.

Taking the whole evidence together, I am clearly of opinion that the caveators have failed to make out a want of capacity in

the testator at the time the will was made, and that there is no evidence of fraud in the procurement of it. The case, to my mind, is entirely clear, and I shall therefore affirm the decree of the orphans' court ordering the will to probate; and shall further order that the costs of this appeal be paid by the appellants. This is not usually done, nor ought it to be where there is a fair ground for re-examination before the court. It is because no such ground is perceived that costs are awarded in this case.

Decree affirmed.